**Charles Cleve BOLYARD, Plaintiff,**

v.

**Robert C. WATSON, Commissioner of Patents, Defendant.**

Civ. A. No. 3033–57.

United States District Court
District of Columbia.

Nov. 17, 1959.

Lyon & Lyon, by Charles G. Lyon, Los Angeles, Cal., for plaintiff.

David Kreider, Washington, D. C., for defendant.

RICH, Judge.*

This is an action under 35 U.S.C. § 145, by virtue of which the Court has jurisdiction of the issues and the parties. Charles Cleve Bolyard filed an application for patent, Serial Number 548,-432, on November 22, 1955, entitled, "Sequin Impregnated Paper and Process for Making Same." Claims 7, 8, 9, 10 and 11 thereof are here in suit, all of these claims being directed to an article of manufacture, namely, an ornamented paper. The title of the application has been appropriately amended, after a requirement of restriction, by deletion of reference to process.

In the final rejection of the claims here involved, only two prior United States patents were relied on, namely, Beck, 322,034, issued July 14, 1885, and Perkins et al., 681,074, issued August 20, 1901.

Claim 7 is the broadest claim and reads as follows:

"7. An ornamented paper, comprising: a flat paper sheet; and a multiplicity of small sequins having flat sides, set into the paper sheet and disposed in a plane common to said sheet, said sequins being held by filaments of the paper extending over the opposite flat sides of the sequins, the number and density of such filaments being insufficient to impair visibility of the individual sequins from at least one side of said paper sheet."

Claims 8, 9, 10 and 11 each include imitations additional to those found in claim 7, and if claim 7 is patentable, the narrower claims a fortiori would be patentable.

Neither reference discloses a product like that produced in evidence as an exhibit and said to embody the plaintiff's invention. This paper product is a white tissue paper, over the surface of which there appear to be scattered at random a multiplicity of small pieces of shiny metal foil of different colors, mostly rectangular in shape and about a sixteenth of an inch square, some, however, being larger and cut to special shapes such as stars, bells and hearts. The general impression one gets is of a sheet of common white tissue paper on the surface of which fine confetti has been scattered. This exhibit closely resembles the illustration of the article of the invention as depicted in plaintiff's application drawing.

The product of the exhibit is a commercial product. When it was first produced in 1956 it immediately received market acceptance and has enjoyed substantial sales, at least during the three years, 1956, 1957 and 1958, during which period several million packages have been sold, at more than twice the cost of plain white tissue paper.

In plaintiff's application, the first object is stated to be the provision of a paper "wherein randomly scattered sequins formed of metal or plastic foil are impregnated therein." As showing what the plaintiff meant by the term "sequins," the following excerpts from the specification are relevant:

"The sequins may be formed of anodized aluminum foil, as indicated

* Judge, United States Court of Customs and Patent Appeals, sitting by designation.

by 12 in Figs. 2, 3, 4, and 5, or may be formed of various plastic materials, as indicated by 13 in Fig. 6. The sequins may vary in size from 1/32" to 1/8" and may have any desirable configuration, that is, they may be circles, polygons, stars, or the like, as indicated in Fig. 2.

\*    \*    \*    \*    \*    \*

"By way of example, it has been found that sequins having a thickness of .0024" may be impregnated in tissue paper having a normal thickness of .0017". The added thickness of the fibres over the surfaces of the sequins may increase the thickness in these regions by a fraction of thousandths of an inch, for example, as little as .0001. These dimensions will, of course, vary with the thickness of the paper products and with the thickness of the sequins used."

The specification explains how the sequins are "impregnated" in the tissue paper by metering them into a flow of water which is being fed into a mixing box between the stuff box, which is supplied with stuff from the beater, and the flow box from which the stuff moves to the slice through which the stuff moves onto the cylinder or wire screen on which the paper is laid. The agitation produced by the water stream causes the sequins to be thoroughly intermingled with the paper fibers in the stuff which is thereafter converted into paper in the usual way. It will be noted that the sequins are not subjected to beater action.

The Patent Office Board of Appeals gave little weight to the Perkins et al. patent. It said with respect thereto:

"In considering the art, we find that Perkins et al. is cumulative only to the reference Beck. We are of the opinion that if the rejection is not properly sustainable on the reference Beck it can clearly not be sustained on Perkins et al. Thus, we will not consider the Perkins et al. patent further."

The defendant appears to have been satisfied to treat the Perkins et al. reference in this Court in a similar fashion. Since the Court agrees with the Board on this point, there remains but a single issue, namely, whether the patent to Beck furnishes a sufficient basis to sustain the rejection of the claims.

Being mindful of such cases as Abbott v. Coe, 71 App.D.C. 195, 109 F.2d 449, and the Bullard Co. v. Coe, U.S., 79 App. D.C. 369, 147 F.2d 568, which require that the decision of the Patent Office be sustained by this Court unless it has been clearly shown to be wrong, I am of the opinion that the Beck patent is insufficient to negative the patentability of the claims in suit. The penetrating examination of that reference during the trial served only to confirm the same conclusion reached on the basis of an independent study of that patent before the trial, plaintiff having submitted a copy with his trial brief.

The Beck patent, which issued in 1885 on an application filed the same year, contains no drawing and but two pages of specification. It is entitled, "Decorating Wall-Paper." The broad object of the invention, as stated by the patentee, is to mix with the paper, while yet in the wet pulp state, certain "bodies" which give the surface of the paper a "glistening, colored, or other ornamental appearance." To achieve this result, Beck states that his invention resides in admixing "with the pulp from which the paper is to be made finely-comminuted mineral bodies, such as mica, talc, sand, glass, and other like bodies capable of producing a glistening, colored, or ornamental appearance when seen upon the surface of the finished paper, \*    \*    \*." Such "bodies," he says, may be incorporated in an amount of from five to sixty per cent of the entire mass.

The patentee further says: "\*    \*    \* these bodies so admixed may in many, and, in fact, most cases, *take the place of the ordinary fillers used in the manufacture of papers* in whole or in part— such as clay, terra-alba, wood pulp, and the like." [Emphasis mine.] He explains that when the paper is finished, the particles will appear on the surfaces of

the sheet to give it a glistening or colored appearance, and that such an appearance may be made to resemble, among other things, "a solid sheet of mica, etc., as the case may be, by the employment of from forty to sixty per cent. of such bodies, * * *." Again referring to mica, talc, glass, sand, and so forth, the patentee refers to "minute glistening or colored spots" on the paper, and defendant's counsel emphasizes the word "spots."

Thus far, I am unable to see in the disclosure any suggestion for the making of paper which contains anything which might reasonably be called a "sequin," in the sense in which plaintiff uses the term, which appears to be its ordinary sense.

Webster's Dictionary (1937 Ed.) defines sequin as:

"2. A metal disc or spangle used for ornamentation in costume, drapery, etc."

It further defines "spangle" as:

"1. A small plate or boss of shining metal; something brilliant used as an ornament, esp. when stitched on the dress. Hence, any little thing that sparkles; * * *"

Taking such definitions, together with the plaintiff's own description of what he intends by the term sequin, I cannot see that it is met by any material aptly described as finely-comminuted or finely-divided, which is the condition of all of the materials or "bodies" disclosed by Beck.

Again referring to the dictionary, "comminute" is defined thus:

"To reduce to minute particles, or fine powder; pulverize; triturate."

And, in turn, "triturate" is defined as meaning:

"2. To rub or grind to a very fine or impalpable powder; to pulverize and comminute thoroughly."

Coming now to the part of the Beck patent most relied on by defendant, it is the suggestion—and it appears to be little more than that—that "gold foil" may be used as one of the "metallic bodies" which is incorporated in the paper pulp and appears in the final product. There is no direct or positive statement as to how this "gold foil" is incorporated or in what condition it is incorporated, whether it is finely comminuted when first added to the pulp or not. But even assuming that "gold foil"—whatever Beck meant by that term—were used, there is certainly no suggestion that the appearance of the gold in the finished product is in any form which might be described as a sequin or spangle.

Immediately preceding the mention of the gold foil, the Beck patent says, "In addition to the above-named bodies, I introduce into the pulp *in the same manner* certain *metallic* bodies," [emphasis mine] and he then gives gold foil as an example. Up to this point he has been discussing "mineral bodies" and the emphasis here is on metallic bodies, the use of both mineral and metallic bodies being claimed. As to the manner of introduction of the previously discussed mineral bodies, the sole teaching of the specification is that they are admixed with the pulp in a finely-comminuted or finely-divided state and that, so admixed, they may take the place of ordinary fillers, as quoted above. Immediately after mentioning gold foil, the patentee says, "I may use other metals *finely divided*," [emphasis mine]. I find no suggestion to use the gold foil in a form other than finely divided.

There are other considerations which were brought out at the trial which have a bearing on what the Beck disclosure would actually suggest to one skilled in the papermaking art. Two experts in paper manufacturing testified that the Beck teaching indicated to them that Beck contemplated adding his "bodies" to the pulp in the beater, where fillers are normally added. They further pointed out that it is not permissible for abrasive granular materials such as glass or sand to run through a paper making machine in other than a finely pulverized state and that elaborate systems of traps

and screens are provided to remove any such particles which are not pulverized. The beater action is such as would tend to reduce any pieces of metal foil to a pulverized state. Furthermore, on the subject of "gold foil" it was pointed out that perhaps this should not be taken too literally. Enough real gold foil to add 5% of plaintiff's sequins, made of gold instead of aluminum, to 360 grams of raw pulp stock for a test on a laboratory scale would have cost $350. To make 8,000 pounds of plaintiff's tissue paper takes 600 pounds of aluminum foil sequins and an equivalent amount of gold foil, making allowance for the difference in specific gravity, would be worth some $4,300,000. One is led to surmise that Beck probably intended gold leaf by the term gold foil, gold leaf being much thinner, and more than likely imitation gold leaf. Ex parte laboratory tests made using the latter, introducing in sheets and beaten with pulp for 40 minutes, which pulp was then made into paper, showed the imitation gold leaf in the paper to be in the form of fine particles which look like brown specks. It was argued that Beck would not necessarily have put his "bodies" into the beater. While that may be true, he did not tell where to add them and the experts who said that is where they would be led by the disclosure to add them were uncontradicted.

Beck does not seem to have regarded his invention as residing in the incorporation in the paper of objects such as sequins, but rather "particles," and only those which are comminuted.

While one does not usually look to the claims of an issued patent for its disclosure, it nevertheless seems significant in this case that eight out of the ten claims of this Beck patent, in describing the material whether mineral, metallic or both, incorporated in the pulp, use the term "finely-divided." This corresponds with the initial statement of the invention which is that "finely-comminuted bodies" are used.

■ Under the law, plaintiff is entitled to a patent on his claimed invention if it meets the statutory requirements of novelty, utility and unobviousness to a man of ordinary skill in the art at the time the invention was made. 35 U.S.C. §§ 101, 102, and 103.

■ The Board of Appeals wrote a rather long and apparently carefully reasoned opinion in the course of which it persuaded itself that plaintiff's claim 7 "reads directly upon the disclosure of the [Beck] reference." In this I am convinced that the Board erred. The error of the Board resides in its method of rationalization. Instead of looking at the reference to see what it teaches and then turning to the problem of whether in view of that teaching the applicant's claimed invention is disclosed or would have been obvious, it proceeds from a complete knowledge of applicant's invention and then creates out of the Beck disclosure by interpretation a mere verbal correspondence with claim 7. To do this it first converts Beck's "finely-comminuted * * * bodies" into "a multiplicity of small objects incorporated in the paper." Beck, however, nowhere mentions "objects." It then finds among those "objects" Beck's mica which, it says, comes in flat flake form, as is well known, and which Beck teaches may be colored. It then says that the term "sequin" embraces mica as a possible material. On this foundation it concludes that Beck discloses "sequins." I find, on the contrary, that even with a considerable amount of imagination applied to the Beck disclosure it does not remotely suggest sequins, according to the common meaning of the term or as it is used by plaintiff. A reasonable interpretation of the term "sequin" does not include powdered mica, notwithstanding the fact that even in that state the form of the particles is flat flakes. The Board, and the solicitor for the Patent Office at the trial, also pointed to the use of the words "glistening or colored *spots* of different colors" [emphasis mine] used by Beck, while omitting reference to the modifier "minute" which he used. This use of the word "spots" was apparently regarded as bolstering the premise that Beck's patent contains a disclosure of sequins. Read in context, however, Beck was saying no more than that the shining par-

ticles of his mineral or metallic "bodies" on the surface of his paper caused it to glisten by reason of the *minute* spots of reflected light which they produced, as the sand on the beach glistens in the sunshine. It is the whole surface of Beck's paper which appears to glisten, not discrete *objects* such as sequins set into the paper and individually visible, which is the characteristic feature of plaintiff's ornamented paper.

I find that the wall-paper, or other decorative paper, disclosed by Beck is different in kind from the plaintiff's paper as disclosed in his specification and defined in claim 7, that claim 7, reasonably construed, does not read on the Beck disclosure and that it defines subject matter patentable thereover. I further find that it is patentable over the Perkins et al. patent. Claims 8 through 11, being more limited than claim 7, are likewise allowable over these references.

For the foregoing reasons, I hold that the Patent Office erred in its rejection of these claims and that plaintiff may have a judgment authorizing the issuance of a patent on compliance with the requirements of law.

This opinion contains the Court's findings of fact and conclusions of law.